The first case on the docket I have recused myself from, and Justice Moore is going to take my spot. I have a conflict, and so Justice Bowie is going to run the morning case, then we're going to take a quick break, the other lawyers can set up, and then I'll proceed. Okay? Thank you so much. Have a seat. Thank you, Counsel. Our first case today is 519-0149 Phillips v. Gale. Counsel, are you ready to proceed? Yes, Your Honor. Go right ahead. May it please the Court. Thank you. State your name for the record, please. My name is Mike Schroer, and I am here on behalf of Appellant Jane Gale. Good morning to the justices of the panel. I'll begin by just addressing immediately the appellant's first point, which is her assertion that the trial court abused its discretion in barring the defense trial medical expert, Dr. Williams, as a Rule 219 discovery sanction. As the Court no doubt knows, the standard of review for imposition of Rule 219C sanctions is an abuse of discretion standard. Rule 219C itself tells us that sanctions are appropriate and the courts may impose them when a party unreasonably fails to comply with discovery rules or orders. We have a little bit more on what that means from the King case, which is cited in both of the parties' briefs. And what King tells us is that in order to have a conduct or have a party engage in conduct that's unreasonable to the extent that it mandates Rule 219C sanctions, the party must have acted with deliberate and pronounced disregard for the rule or order at issue, or the party's actions showed deliberate, consummation, or unwarranted disregard for the court's authority. Now, the King case did identify five factors that courts analyzed in reviewing whether any discovery sanction is appropriate in the case. These are addressed in the brief. One of the primary importance in this case is prejudice. The other one, surprise to an opposing party, the plaintiff's diligence in seeking the discovery, the timeliness of objections to discovery, and the good faith of the defendant. I don't believe, with the possible exception of some assertions that have been made about the good faith of the defendant, which I will address shortly here, I don't believe many of those are at issue. So the primary question, I believe, in this case, in terms of whether this discovery sanction was appropriate, is did the defendant fail to comply with the discovery rule or order in a way that prejudiced the plaintiff's case in this matter? That didn't happen. There was no prejudice. I understand that the plaintiff argues primarily that she was unable to effectively cross-examine Dr. Williams based on some limitations in the information that he put forth in response to discovery and subpoena in the case. Presumably, I think that the case law indicates that the reasons for information like this being sought are, of course, so the opposing party can challenge the credibility of an expert witness to trial. In order to do that, obviously, presumably the plan for which to establish that Dr. Williams had a history of doing medical legal work, that he often did it for defense attorneys, and that he earned a not insignificant amount of money doing that in the service of a challenge to his credibility, arguing that he may have had relationships with defense attorneys that he wished to preserve. The issue in this case is that the plaintiff did have information that was absolutely sufficient to make this kind of a credibility challenge for Dr. Williams. Substantial information was disclosed about him over a five-year period, which was the period that was requested in discovery. The defendant disclosed the amount of money he's made during that time period, his interactions and the amount of his interactions with defense counsel, with defense insurance carrier. The defendant disclosed the number of times he, well, that she had retained him, which was only once in the case. And in any event, the upshot of this information was that Dr. Williams had earned something on the order of $215,000 or $18,000 in five years doing this. He also disclosed a list of his depositions and things of that nature. The primary issue seemed to be that Dr. Williams did get served with a subpoena, or his office did, and in responding to that subpoena, his office did produce some information. One thing they did not produce was the tax returns. I understand that that was subpoenaed, and it absolutely would have been defendant's preference that he simply produce that information. Fortunately, he did not do that. However, the fact remains that the information that was produced about his income and things like that came from his office, and they're the people who are tracking this information. So the information that was available in order to challenge Dr. Williams' credibility on these issues was absolutely sufficient to do that. So to the extent there were limitations in Dr. Williams' response to the subpoena, that I don't think is something that prejudiced the plaintiff's case to such an extent that it merited a remedy as extremes, barring Dr. Williams from testifying in the case. Additionally, this remedy was too harsh. And the reason for that, and the reason that the defendant feels that it was an abuse of discretion, is that this remedy essentially determined the outcome of the jury's damages award in the case, which is ultimately what was at issue insofar as this was a case of admitted liability. This ruling, barring Dr. Williams, served as the basis for precluding the plaintiff's defendant from introducing evidence of the plaintiff's prior accidents and conditions in the case under Voightkin. As a consequence of that, the jury heard some evidence about what the plaintiff's preexisting conditions were, but not their full extent, and I'll talk a little bit more about that in a minute, but that's critical because this is an aggravation case, and the question is, what did the accident add to the problems that the plaintiff already had before the accident occurred? So the jury didn't see the entire picture, had no way of understanding the before and after picture, and this ruling also served as the basis for the trial court entering a direct verdict against the plaintiff under medical special damages because that was done because the defendant didn't affirmatively put on evidence, challenge the plaintiff's evidence, but didn't affirmatively put on evidence to refute the opinions of the medical witnesses who were in the case. So essentially, this is a situation in which it appears that the plaintiff had the information that was necessary to challenge Dr. Williams' credibility, and then in addition to that, the remedy that was given in barring Dr. Williams really changed the nature and the outcome of the case in its entirety. As for the bad faith issue, that is something that is argued fairly extensively in the plaintiff's brief. I don't believe there was any bad faith in the case. Again, we certainly would have preferred that the doctor furnished us and the plaintiff with all the information that possibly could have in response to discovery and not have had this issue. However, there's a section in the brief where this is actually quoted. The trial court did openly acknowledge that there was nothing in the nature of scienter. It was just an expert who failed to respond to a subpoena, which the court acknowledged happened sometimes. It wasn't the fault of counsel or anything like that. Well, let me ask you this, counsel. When it got to that point, how many times had there been a request or motions for extensions, whatnot, to try to get this information from the doctor and turn it over to opposing counsel? If memory serves me, there were initial discovery requests that the defendant responded to, and there were objections that were raised, and then there was an order directing the defendant to respond to the discovery more fully, which we then did with all the information we could as best as possible. And along those lines, in that same time frame, Dr. Williams' office was subpoenaed, and a person from his office appeared for the deposition and did that. The case, I believe, was kicked once so that this could be completed. And I certainly appreciate that the court did get on the second bite of the apple by allowing the trial date to be continued and things like that, but the fact still remains that we produced everything we possibly could, and they did have the information when it came to trial that was available to them that they could have used to attack this guy's credibility. And in addition to that, it seems to me that if the purpose of this information is to challenge the expert's credibility, the fact that he didn't respond to the subpoena is certainly something that could have cross-examined him on, and I imagine that doesn't help our case, and I don't think that that necessarily hurts their case. So if anything, I think what occurred may have been less favorable to the defendant than the situation would have been had he simply just produced the information as he was asked to do. When you keep saying, you know, we disclosed, well, we being you and co-counsel, I think that's what the trial judge acknowledged was if I read the record correctly, he said it's basically not your fault. I can tell you've done what you should have done. It's the, I think what he called them the rogue experts, wasn't turning over, you know, fully. And basically, like I said, as I read it, he acknowledged that you had done everything you could do, but unfortunately you had this doctor that wasn't producing what opposing counsel was seeking to get, full disclosure, and a trial looming within 30, 45 days, I believe, from the last time you all were in court and the judge made that ruling. Is that correct? I believe that sounds correct, Your Honor, yes. So at what point, my question, you know, the trial judge is supposed to be making sure that both sides get a fair trial, discovery is going back and forth, each side is able to effectively question witnesses and whatnot. At what point, then, does the court just say, you know, I've given you the opportunity, it hasn't been done, so as a sanction, I'm going to make this ruling? I understand the court's question and the point there. I think that part of the issue is the harshness of the sanction and the factors of the King case. And again, you know, I'm not defending the doctor, I'm not responding to his subpoena. What I'm arguing is that under the circumstances, with all of the financial information that was produced, there was sufficient information to do this. And additionally, you know, the court, I believe, had within its power to just issue an order saying, you know, Dr. Williams' office must produce the information in its entirety pursuant to the subpoena, you know, several weeks before trial, a week before trial, what have you. And I think that that probably would have solved the problem, you know, if they were hit with a court order that made it clear that there would be consequences and that this was very serious. And, you know, had that been done, I think what may have occurred was that, you know, the doctor hopefully would have produced that information, and it wouldn't have changed the nature of what was available to the plaintiff for the cross-examination materially because they already had the information about his earnings. You know, the information that he didn't produce was the tax returns. I believe that there was a discrepancy on some information that we had from a disclosed discovery and some information that he had about an invoice, which I think had about a $500 difference. And then I think another point of contention was that in assembling his list of depositions and IMEs and the charges for those things, his office didn't include cancellation fees and things of that nature. So, you know, these are all things that don't seem to change the material basis of the credibility challenge, which is that, you know, this doctor, as, you know, many experts are, have worked with one side or the other, has been paid to do that and may have some relationships he wishes to preserve. I think that that situation is essentially the point, and, you know, things having to do with the actual specific dollar figures, you know, down to the penny and discrepancies of that nature are less important for that because, you know, the purpose is the question of the doctor's motivations in challenging his credibility. It's not, you know, challenging his office's diligence in, you know, maintaining great records about his financial or his earnings from this kind of work. And I will go ahead and move on to the appellant's second point unless there are additional questions. Obviously, you reached a point of crisis when the motion to bar Dr. Williams was heard and the judge rejected defense's arguments. Could you suggest a less severe sanction that the court could have employed that would have allowed a more sufficient hearing on the merits? And avoid the harshness of the barring of a witness? Well, my thought is that the sanction in and of itself may have been somewhat premature insofar as I do believe that this could have been remedied with a simple order directing the doctor to appear for another deposition or to present someone from his office appearing for a deposition pursuant to the subpoena and producing this information. And so I feel as though it may not have been a case in which a sanction was appropriate because I think that this really could have been remedied in that way. And, you know, even if it was not remedied in that way and even without the court having made that order, I don't know that a sanction is appropriate at all under King, and that is because of the prejudice issue. You know, certainly I'm not suggesting that doctors should be let off the hook for subpoenas or anything like that. What I'm saying is that under the facts of this specific case, with the amount of information that was produced and with the fact that it was coming largely from the record-keeping personnel at his office, you know, the information was handed over. It's a shame that we weren't able to get ahold of the tax returns. We would have loved to produce those. But the information on the tax returns would have reflected the doctor's income for his medical legal work, presumably, insofar as that's what they were sought for. And that information was already in the plaintiff's possession at the time when this issue kind of came before the court. I will go ahead and move on to the second point if there are further on that one. Okay. So the plaintiff's, or excuse me, the appellant's second position or point on appeal is that the trial court also views its discretion in excluding and limiting the evidence of the plaintiff's prior injuries and conditions. This is an evidentiary question, so, again, this is reviewed under the abuse of discretion standard. The primary case on this, as I'm sure everyone knows, is Voykin, which is a 2000 Supreme Court case that held that, in general, defendants must present expert testimony to establish the relevance of preexisting or prior conditions in an injury case because wagers really can't be expected to understand that. In the Voykin opinion, there is an exception written into it that indicates that this rule applies unless the trial court's discretion determines that the natures of any prior and current injuries are such that a layperson can readily appraise their relationship, if any, between those injuries without expert assistance. Now, again, this is an aggravation case, and the plaintiff essentially was claiming that the accident issue aggravated some preexisting conditions that she had. So the question that that presents to the jury is what proportion of plaintiff's post-accident problems were related to the accident as opposed to other causes. In other words, the before and after picture, how was the plaintiff post-accident compared to how she was before the accident? In order to make that determination, I think that the jury had to know fully and fully understand how the plaintiff was doing before this accident occurred in order to understand what the accident may have added. And I think that the Felder case, which is cited in the appellant's briefs, recognized that lay jurors can understand the relevance of evidence of preexisting conditions when they're being asked to determine the extent of an aggravation. This type of before and after evaluation, which really is necessary in an aggravation case, doesn't really require medical opinions. You know, the jury heard opinions from the plaintiff's physicians that she had an injury that was aggravated in this accident that seems to me that it necessarily raises the question of, well, what was her injury before the accident? What were her conditions before the accident? Because without knowing that, there's no way that the jury could have known how the accident truly affected her. And there were quite a few things that the jury didn't hear in the case. You know, the plaintiff was in three accidents before the June 2016 accident issue in this case. She completed a questionnaire for her doctor after the June 2016 accident and said on that questionnaire that her symptoms were from an April 2015 bus accident. During her offer of proof, she admitted that the April 2015 bus accident caused tingling sensations in her legs, which is one of the things that was argued in the case. She had documented neck and back symptoms as early as 2015. The medical information indicated that she reached maximum medical improvement for her prior injuries in April 2016, so a couple months before the accident that was at issue in our case, but she still had symptoms. You know, the evidence would have shown that she underwent radiofrequency ablation treatments after this accident, and then the jury did hear that. But is it not here that she also underwent radiofrequency ablations before the accident that they were effective and that her doctor said that these treatments have a tendency to wear off in time, which, you know, seems to raise the question as one of her doctors admitted that, you know, if she's experiencing pain after the accident, it's certainly possible that that is because these treatments, the efficacy of these treatments wore off. And additionally, one of the doctors who treated the plaintiff and was an expert witness in the case for the plaintiff was a pain management doctor named Caleb Twell, and she said in her evidence deposition or she acknowledged that in a May 2017 record she herself was attributing the plaintiff's symptoms to multiple car accidents. In her evidence deposition, she disclaimed that opinion and attributed everything to the May 2017 accident. And so in addition to the information that the jury didn't hear about what was really going on with the plaintiff before the injury occurred, they also didn't have the opportunity to evaluate the credibility of Dr. Twell's opinion that, you know, the May 2016 accident caused all of these problems or was causing the symptoms as of May of 2017. They had no ability to evaluate the credibility of that opinion with respect to the fact that, you know, she said something entirely different in her medical records. So, you know, if the jury had heard this evidence, they would have understood that the June 2016 accident didn't cause the leg-tingling symptoms the plaintiff had. It was from the prior accident, as she noted both in her testimony and on the questionnaire indicating the symptoms. Go ahead and finish. In general, were like that. And the jury also didn't hear that one of her physicians believed at one point that multiple accidents, ours and the April 2015 bus accident the plaintiff was in, were causing her symptoms. So there was quite a bit that the jury didn't hear on this issue. And I believe that, you know, had they heard this information, they would have had a better understanding of what was going on, which would have given them, before the accident, which would have furnished them with the information they needed to know to evaluate the damages about how the accident affected her and affected those pre-existing conditions. I will, being out of time, I think I will excuse myself. Do you have any questions about the last point? No. Obviously, counsel will have the opportunity for a vote. Thank you. Thank you. Good morning. Good morning, Your Honors. May it please the Court. Counsel, my name is Michelle Rich. I represent Marsha Phillips in this case. And it's a pleasure to be here this morning. I think this is the first time I've appeared before both of you. And, Justice Wharton, it's a pleasure. I know I've never, I never personally had the pleasure of appearing before you. But I know my father, Tom Rich, has many times. So I know he'll be pleased to hear that you were here this morning. So, obviously, it's our position that the trial court did not abuse its discretion in this case. And the defendant is not entitled to a new trial in this case. And I apologize. I'm a little under the weather. So if you can't hear me, please let me know. I will do my best to speak up. Mr. Schroer is correct that this is an abuse of discretion standard. And I think I agree with him that the essential point in this case that's going to determine the outcome is Dr. Williams being barred as a discovery sanction. I think the remainder of the defendant's issues and points on appeal kind of stem from that issue. So I'd like to primarily focus on that, as Mr. Schroer did. So, Your Honor, you raised a question about at what point does the trial judge just say enough is enough. You know, you've had time to do this. And you haven't done it. And your expert hasn't done it. And, therefore, this is the appropriate remedy under the law. I laid this out in my brief. But the facts in this case are pretty substantial in terms of supporting the trial court's decision in this case. So the initial point that I'd like to note is that the defendant was actually given extra time to name this expert, according to the case management order. That was granted by the court. And the trial date was actually pushed back three months to give the defendant extra time to designate this expert witness, Dr. Williams. Right after that ruling was made by the court, we sent expert interrogatories and requests for production of documents. And those responses were due about six or seven weeks after they were sent out. The answers were incomplete. The defendant objected to providing almost all of the information that was requested. We filed a motion to compel not even two weeks later, on October 4th of 2018. The court granted our motion on October 15th, ordered the defendant to produce responses by November 14th of 2018. We also issued a subpoena to the records custodian of this doctor's office on October 10th of 2018, set that custodian's records deposition on 10-30-18, which proceeded. Significantly, the records custodian who appeared for the deposition, her testimony in this case I think is substantial. She testified that she did not produce a bevy of documents that she could have produced and chose not to. She did not produce cancellation fees, a list of medical legal exams with patient names. She inappropriately listed deposition charges as $1,500 instead of $2,000. She agreed that her figures were inaccurate. She didn't include charges for phone calls that the doctors had between attorneys. She could not testify that she produced my client's entire chart. She did not know and did not check if Dr. Williams had kept a list of depositions in compliance with the subpoena. She could not testify to the gross payments that Dr. Williams received, even though that information she testified would have been available. No 1099s or tax records were ever produced. Defendant in one of its discovery responses indicated that a payment was made in the amount of $2,500 by State Farm for medical legal work done by Dr. Williams, but there was never any corresponding record from that doctor's office that showed a payment in the amount of $2,500. The most payment that was ever shown, according to that doctor's office, was $2,000. So in light of all of that, the day before we were set to proceed with Dr. Williams' evidence deposition, the judge heard our emergency motion to bar Dr. Williams and granted that. And I think the case on point, I know that Mr. Schroer cited King to you, which is a 1987 case. I referenced a case in my brief, Frazier v. Jackson. It's a 2014 case from the 2nd District, and I think it really sheds light on the appropriate standard and why the courts impose this type of a sanction in these situations. And what the court said in that case is the purpose of such sanction is to affect discovery, not punish a dilatory party. And that's what the court was, I think, trying to get at when he was telling Mr. Schroer, you know, I know this is nothing you did. It's not a personal ruling against you, but this is what I have to do now that you and your expert have not done what they are required to do under the law. And the court goes on to say where a party fails to comply with the provisions of Rule 213, a court should not hesitate sanctioning the party as Rule 213 demands strict compliance. And in Frazier v. Jackson, it was the very same issue. The defendant had retained an expert who refused to abide by several court orders compelling him to provide financial information, including tax returns, and some of that was produced, but not all that the court had requested. And the appellate court upheld the trial court's ruling that this expert was barred, and it did not abuse its discretion in doing so because the defendant continuously and systematically disregarded the trial court's multiple orders to produce discovery. By retaining Dr. Scholaski as an expert witness, the defendant was subject to the requirements of Rule 213. On three separate occasions, the trial court ordered the defendant to comply with plaintiff's subpoena. After several weeks, the trial court finally ordered the defendant to produce Dr. Scholaski's income tax returns as additional discovery that could establish bias or prejudice. It did not comply by the court-imposed deadline. And in this case, the defendant, like the defendant in this case, argues that the tax information and the information that was provided was more than sufficient to demonstrate whether that was biased. And the court rejected that argument and said that that doesn't matter. That's not the appropriate standard. You're required to produce these things when you obtain a controlled expert witness in order to fairly allow the other party to cross-examine that expert because these expert witnesses, as the court noted, have substantial experience in these matters and they are expert testifiers. And the Trower and Sears cases also speak to that, that the Supreme Court has specifically held that that information is discoverable and should be disclosed in these types of cases. Do either of you have any questions on that point? I think that that is the majority of what I wanted to cover with respect to that point on the trial court's ruling. I don't. Okay. Thank you. So with respect to the second issue of an aggravation of a preexisting condition that Mr. Trower talked to you about, and the trial court's ruling of excluding evidence of Ms. Phillips' prior injuries, I think what the trial court actually did in this case was more than fair to defendant and to plaintiff because what the trial court did is ruled that evidence of Ms. Phillips' degeneration was admissible because this is an aggravation of a preexisting condition case, but excluded, and rightfully so, evidence of prior injuries and prior car accidents and relied on Boykin and the Hawks case, which I also cite in my brief, which is a recent Fifth District case. And this is also an abuse of discretion standard. And if you have reviewed the record, there were extensive arguments heard on this in the pretrial conference, and I think the court absolutely came to the right ruling in this instance. And what Boykin cautions us about, which I'm sure you know, is that this type of knowledge is not generally within the can of the average juror. It's a complex issue, and the Boykin court made it clear because of this complexity, we do not believe that in normal circumstances a lay juror can effectively or accurately assess the relationship between a prior injury and a current injury without expert assistance. And it put the burden on defendant to establish why any evidence of a preexisting injury is relevant in this case. And obviously, they had no medical expert witness at the time of trial because Dr. Williams' testimony did not come in, and they failed to meet that burden, they failed to show why the preexisting accidents were relevant, because no doctor had ever linked up Ms. Phillips' symptoms and conditions to this motor vehicle collision to her preexisting conditions, her preexisting accidents, rather. And specifically, if you look at the testimony of both physicians who testified, Dr. Gornett and Dr. Butuel, they both attributed her symptoms after this motor vehicle collision to that motor vehicle collision. They never testified that any of her symptoms were related to any prior motor vehicle collisions, and the defendant did not have any evidence to rebut that at the time of trial. And interestingly, even if you were to take the extra step to assume that Dr. Williams' testimony should have come in at the time of trial, the defendant submitted an affidavit as an offer of proof at the time of trial, and what Dr. Williams' affidavit says is he believes that Ms. Williams suffered an injury as a result of this motor vehicle collision, but that he believed that some of her symptoms were related to preexisting degeneration. Well, that's consistent with the evidence that the trial court allowed in this case. Dr. Williams didn't even attribute her prior or, excuse me, her symptoms following this motor vehicle collision to any of her prior accidents. So the trial court's ruling is absolutely in line even with that evidence, even assuming that you would allow that evidence in. So I think the trial court's ruling on that issue is absolutely supported by the evidence, and there's no evidence that the trial court abused its discretion with respect to that. Any questions on that issue? Do you have any questions for me in general on any of the other issues? Those were the two issues that Mr. Schroer primarily had time to focus on, so he didn't really get a chance to discuss any of the others with you, but is there any other questions you have for me on any of those? I don't. In all periods, it's kind of a domino effect. Exactly. Once you've barred the expert testimony, then everything kind of stemmed from that to a certain extent. I think that's correct, Your Honor. On the issue of the directed verdict against the damages, recognizing that it's been held that this is something that has to be given absolute scrutiny on review because, of course, damages are uniquely within the province of the jury to consider and decide as a question of fact. In your opinion, there's absolutely nothing that would have given the jury any issue of fact that they could decide that would have defeated a motion for directed verdict on damages. On the issue of Ms. Phillips' medical bills that were already incurred, Your Honor? Yes. No, I believe that's correct, and if you look at the evidence that was submitted, both physicians testified to their charges being reasonable and customary. In fact, that was stipulated to at the time of trial. There was no evidence that she did anything other than follow her doctor's recommendations, and I looked at the case that Mr. Schroer cited in his brief on this issue to support that that decision was not appropriate to direct the verdict on that issue of the past medical bills, Baker v. Hudson. And in that case, the appellate courts overturned the directed verdict, and basically what they said is that there was evidence that the plaintiff's attorney had referred the plaintiff to several doctors. There was evidence that the plaintiff did not follow emergency room physicians' recommendations. There was evidence that she completed a questionnaire, that the purpose of her visit was to find injuries due to the automobile accident, and there was a significant gap in treatment almost a year after her doctor released her. So there were numerous issues in that case that the appellate courts said, no, there was enough for a jury to potentially conclude differently, but in this case, there's nothing that the defendant, I think, could hang its hat on. This woman sought treatment immediately after this motor vehicle collision. She was seeing doctors that she had already seen before who testified that her condition was worsened and attributed to this motor vehicle collision. She consistently sought treatment, and her physicians testified to that. There was no contrary evidence at all put on by the defendant with respect to any of those issues. So in this particular case, I think that that was appropriate. But I do understand that, you know, I recognize the scrutiny that the appellate court needs to give to that particular issue. So I appreciate your question on that very much. I can't see your time. If I may, we can hit briefly the next two, regarding Dr. Gornett. I believe my notes are correct here. He was treated not as an expert, but just as a treating, correct? Correct, Your Honor. But it was a disclosure issue regarding monetary issues, correct? Correct. What the court did was struck the defense's interrogatories and requests for production. That it had directed to Dr. Gornett, and the court indicated, you know, Dr. Gornett's a treating physician. He falls under 213F2, not 213F3, and he's not subject to those requirements. I think that that is specifically been upheld by the courts in numerous cases. I talk about several cases in my brief that discuss the distinction that the courts have found between treating physicians and expert physicians. And the cases that the defendant has cited, those physicians who are subjected to more questions regarding their income, and how many cases that they have handled on behalf of plaintiff's law firms, those were expert witnesses in those cases. And I think it's important to note that the court did allow Dr. Gornett to answer some of those questions at the time of his deposition. There were questions asked about how many depositions he gives and how much he charged for depositions. So those things did come into evidence at the time, and I think that the jury was able to assess Dr. Gornett as a witness with that in mind. So I think that the trial court appropriately limited it to those types of questions. And I believe the last issue is that trial court excluded any evidence regarding the plaintiff's religious beliefs as far as blood transfusions that might relate to future medical treatment, correct? Correct, Your Honor. My client is a Jehovah's Witness. That's her religion. And Jehovah's Witnesses do not – some of them don't accept blood transfusions. So defense counsel attempted to question Dr. Butuel about blood transfusions and whether or not those would be required in a fusion surgery. The court appropriately struck that evidence, and I think Rule of Evidence 610 specifically speaks to that. And it specifically discusses the reason why religion is not allowed to challenge the credibility of a witness's testimony or bolster it. And that's exactly what the defense was trying to do. It was trying to question the plaintiff's credibility when she suggested that she could potentially have this fusion surgery. The defense essentially wanted to malign my client's credibility by saying, well, you don't take blood transfusions. So you may not have this surgery. And that's specifically what Rule 610 is designed to prevent. So I think the court appropriately struck that testimony. The other interesting thing is that – and another reason why I think the trial court's decision is supported in that regard is because that question wasn't even asked to my client's surgeon, Dr. Gornett. It was asked of Dr. Butuel, who's the pain management physician who was providing her with injections. So the basis for Dr. Butuel's opinions on whether a blood transfusion would even be required for a fusion is not supported. There was no proper foundation laid for that. She's not a surgeon. She didn't testify to her background as a surgeon or her ability to perform surgery. So, therefore, the foundation was completely lacking for that line of questioning, which is another reason why I think the court appropriately struck that testimony and that reference. And I think those are the remaining issues. So, excuse me, any other questions that either of you have? Otherwise, I think I will conclude. I think the trial court mentioned that there was a possibility still that even if she had the current time of trial, the job of witness, she might change. Or maybe the imminent necessity of having the operation might cause her to accept a blood transfusion if one was needed. Right. And I think another important thing, Your Honors, to note is that both Dr. Gornett and Dr. Butuel testified that surgery would essentially be a last resort for her. That she should be maintained with these injections for as long as possible, and if those did not continue to work for her, then and only then would fusion be an option for her. So the jury heard that evidence and rendered their verdict appropriately, I think, based on that. Anything else? Thank you. Thank you very much. Please, the court. Justice Wharton, I'm glad you raised the issue of the directed verdict that was entered in this case because I do believe that it was affected by the fact that the court, before making that ruling, had barred Dr. Williams in the case. However, I would like to point out that even if you take that ruling off the table, there were a lot of things in the case that the jury could have used to question the credibility of the plaintiff's testimony about her injuries and damages and symptoms, and therefore about the legitimacy of the necessity of treatment testimony from the doctors. Those kinds of things include that the doctors acknowledge that there's no medical test for pain, that they're treating the plaintiff's symptoms as they're reported. You know, that being the case, that kind of puts the onus on the plaintiff to be credible enough to satisfy the jury that she's truly having these symptoms, and there were plenty of reasons that the jury could have doubted that. You know, she, the plaintiff and the defendant were passengers in the same car, excuse me, the defendant was driving and the plaintiff was a passenger in her vehicle. These two women were friends. They'd known each other for a number of years. They go to the same church. After the accident, the plaintiff never informed the defendant that she thought she was hurt. The record shows that the defendant dropped the plaintiff back off their car, the plaintiff then went on to seek treatment at the emergency room, but never said, hey, I'm hurt. I mean, that's certainly something that the jury could have looked at and said, I have some questions about these symptoms in this case. You know, the plaintiff claimed that she had quite a lot of symptoms, but she also admitted that she works out for two hours a day. In her trial testimony, in her trial testimony, she gave fairly extensive treatment about, you know, a serious regimen, one that made me feel a little guilty, to be honest. You know, the plaintiff kept seeing her chiropractor after he discharged her. That raises questions of whether she over-treated. And she didn't go see a doctor within several days of her initial ER visit, which she was told to do. You know, all of these things are things that could have caused the jury to suspect that the symptomology testimony, or could have doubted the credibility of the symptomology testimony. And, you know, moreover, with this evidence not coming into the record, or with the direct verdict, we were kind of not able to even raise these issues with the jury in argument. So, you know, these are things we couldn't even really effectively address at trial, and the jury didn't have an opportunity to consider why all of the treatment may not necessarily have the credibility. I'm glad the issue of Dr. Gornett also came up. I don't believe that that is quite necessarily a pure discovery issue. The testimony that the court struck from the record was in Dr. Gornett's evidence deposition, so this is just essentially trial testimony. And he testified that 40% of his patients are active personal injury litigants, that he's got a history of treating patients who are clients of Plaintiff's Counsel's law firm. And, you know, he testified he earns about $200,000 a year doing that. You know, I'm not aware of any law that says that, you know, a witness's credibility can't be challenged based on issues of bias or prejudice simply because he's been designated as an independent expert witness as opposed to a controlled expert witness. So that, I think, is the issue, not all of the cases that are argued in the appellee's brief about Rule 213 and discovery issues. On the religion thing, on the religion issue, excuse me, Illinois 610 does say that you can't introduce evidence of a person's religion for the purpose of challenging that person's credibility. You know, there's not a lot of law interpreting that rule in Illinois. There's a very similar federal law or federal rule of evidence, and cases that have interpreted that have said, you know, look, if the evidence does affect credibility, that doesn't necessarily mean it's out. It just can't be introduced for the purpose of making a full-on credibility attack like that. So in this case, you know, there was a claim that this plaintiff may need a surgery in the future. So the evidence that she had a religion that might have made it difficult or been a barrier or an obstacle to her having that surgery, I think, was important for the jury to hear. And I think that's doubly the case when you consider some of the other things that you've discussed about reasons to suspect that the plaintiff's symptoms were, you know, not as credible as indicated by at least the direct averting. And finally, with respect to the prejudice issue or the issue of barring Dr. Williams, I wanted to respond to at least one thing on that issue. Again, I think that the issue on that under the King factors is the question of prejudice. And we've heard a lot about the things that, you know, the chronology of events and, you know, the nature of the way the discovery dispute originated. I've not heard anything and I've not seen anything in Apelli's brief that actually says how the case was prejudiced. What were they going to do at trial that they couldn't do because they didn't get his tax returns? And, excuse me, what were the things that they couldn't use at trial? And having run out of time, I will conclude unless there are any questions from the justices. No, thank you, counsel. Thank you. Actually, we'll take this matter under advisement. We'll issue a mandate in due course. We're going to stand at recess for just a few minutes. Please, counsel, get ready for the next case. We'll be right back out. Thank you.